## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JEREMIAH W. GREEN,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **CIVIL ACTION NO. 2:06-cv-667-WKW-WC** |
| | **)** | |
| **ELMORE COUNTY JAIL, et al.,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

## DEFENDANT LUKE REAVES'S SPECIAL REPORT

COMES NOW Elmore County, Alabama Jail Corrections Officer Luke Reaves, a Defendant in the above-styled cause, and submits his Special Report to the Court.

## INTRODUCTION

The Plaintiff in this action, Jeremiah W. Green, filed his Complaint against Elmore County Jail Warden Sue Roberts and various fictitiously named Defendants on July 26, 2006. Two days later, on July 28, 2006, the Magistrate Judge to whom this action was referred issued an Order informing the Plaintiff that fictitious party practice is not permitted under the Federal Rules of Civil Procedure and instructing him to file an amendment to his Complaint on or before August 22, 2006 in which he "1. Informs the court of the true names of each 'Doe' defendant who allegedly violated his constitutional rights," and "2. Specifically describes how each of these individuals violated his constitutional rights." Order, July 28, 2006 (Doc. 5). The Court's Order went on to state that

> [t]he Plaintiff is cautioned that if he fails to properly respond to this order service on the fictitious parties will not be effectuated, these persons will not be considered parties to this cause of action, and this case will proceed only against those defendants properly named and on whom service is perfected.

Id.

The Plaintiff responded on August 11, 2006 by filing a "Motion to Add Defendants" and a "Motion in Support of 'Doe' Defendants" (together as one document) in which he sought to substitute the Elmore County Jail with Elmore County, Alabama as a defendant. See Doc. 7-1. Ignoring the Court's July 28, 2006 Order, the Plaintiff additionally sought leave to add a "Jeff Doe." Id. This submission by the Plaintiff did not, as ordered on July 28, 2006, "[i]nform[] the court of the true names of each 'Doe' defendant," nor did it "[s]pecifically describe[] how each of these individuals violated his constitutional rights." Order, July 28, 2006 (Doc. 5). As a result, on August 17, 2006, the Magistrate Judge recommended that Elmore County, Alabama be dismissed as a party to the complaint and that Plaintiff's claims against Elmore County, Alabama also be dismissed. Recommendation of the Magistrate Judge, August 17, 2006 (Doc. 9).[1] In light of the Plaintiff's failure to properly identify the "Doe" Defendants,[2] the Magistrate Judge's Order of August 17, 2006 directed that only Defendant Roberts "undertake a review of the subject matter of the complaint" and file a Special Report and Answer within forty (40) days of the date of that Order.[3] Order, August 17, 2006 (Doc. 8).

However, on January 18, 2007, the Plaintiff sought reconsideration of the Magistrate Judge's August 17, 2006 Report and Recommendation, and/or the Court's August 29, 2006 Order adopting that Report and Recommendation, particularly with respect to the denial of his attempt to plead "Doe" defendants. This Court subsequently ordered Defendant Roberts to respond to the Plaintiff's August 8, 2006 Declaration regarding "Doe" defendants. Order (Doc. 43). Following Warden Roberts's Response, the Court granted Plaintiff's motion to amend his

---

[1] The Magistrate Judge's Recommendation was adopted by this Court on September 11, 2006. See Order (Doc. 13-1).

[2] See Order (Doc. 8), n.1.

[3] By Order issued September 27, 2006, this Court granted Defendant Roberts's Motion for Extension of Time in Which to File Special Report & Answer. Per the Court's Order, Defendant Roberts's Special Report was due October 25, 2006.

original Complaint by adding the identities of the "Doe" defendants and ordered the newly-added defendants – Clarence Buggs, William McCoy, Luke Reaves[4] and Dorothy Weldon – to file a special report within forty (40) days of the date of the Court's Order.  See Order (Doc. 50).[5]

## PLAINTIFF'S ALLEGATIONS

The Plaintiff complains that his constitutional rights were violated by the Defendant in the following manner:

   A.   Right to privacy (HIPAA);

   B.   Violations of the Americans with Disabilities Act; and

   C.   Cruel and Unusual Punishment.

## DEFENDANT'S RESPONSE TO THE PLAINTIFF'S ALLEGATIONS

**A.   Facts**

The Elmore County, Alabama Sheriff's Department operates the Elmore County Jail pursuant to sound policies and procedures which ensure that the rights of all inmates incarcerated therein are respected.  All state and federal prisoners or detainees being held or housed in the Elmore County Jail will be subject to the rules and regulations of the Elmore County Jail.  See Exhibit A, Affidavit of Elmore County Jail Warden Sue Roberts (hereinafter "Roberts Aff."), ¶ 5.  It is the policy of the Elmore County Sheriff's Department to provide proper clothing to persons incarcerated in the Elmore County Jail in order that they may be protected and identified.  Pursuant to this policy, federal inmates are issued a red uniform.  As Mr. Green was a federal

---

[4] Although Luke Reaves was identified as Defendant "John Doe" (a.k.a. Doe defendant #1) in Defendant Sue Roberts's Response to Plaintiff's Amendment to Complaint with Declaration, see doc. 48, on February 21, 2006, Defendant Reaves worked only until 6:00 p.m.  Declaration of Luke Reaves (hereinafter "Reaves Decl."), ¶ 3.  Further, Defendant Reaves denies any knowledge of the Plaintiff.  Reaves Decl., ¶ 4.

[5] The Complaint, Summons, etc. issued to Luke Reaves and Dorothy Weldon were returned as undeliverable; therefore, the Plaintiff was ordered to inform the Court of the correct address of Reaves and Weldon on or before March 19, 2007.  See Order (Doc. 52).  On March 16, 2007, the Plaintiff submitted to the Court the address of Luke Reaves.  See Response to Order (Doc. 53).  As a result, on March 27, 2007 the Court ordered Defendant Reaves to file a Special Report on or before May 7, 2007.  See Order (Doc. 54).  As of the filing of this Special Report, the Plaintiff has not informed the Court of the address of Dorothy Weldon.

inmate, he was issued a red uniform.  Id. at ¶ 6; see also Exhibit B, Declaration of Luke Reaves (hereinafter "Reaves Decl."), ¶ 5.

It is the policy of the Elmore County Sheriff's Department that inmates incarcerated in the Elmore County Jail be assigned cells in a manner which will ensure the safety and security of the inmates and jail staff and will ensure the orderly operation of the Elmore County Jail.  Ex. A, Roberts Aff. at ¶ 7.  It is the policy of the Elmore County Sheriff's Department that no person be incarcerated in a situation within the Elmore County Jail where his life or health may be threatened by another inmate when, by making the situation known to members of the jail staff, he can be incarcerated elsewhere.  All persons being booked into the Elmore County Jail will be given the opportunity to complete an "enemies list."  The booking officer will give the arrestee or detainee an opportunity to make known in writing any person within the jail whom he fears or has reason to believe is a threat to him in any way.  Id. at ¶ 8.

It is the policy of the Elmore County Sheriff's Department that Sheriff's Department personnel employed at the Elmore County Jail be aware of and protect inmate rights, both civil and legal.  These rights include: (a) freedom from discrimination based on race, religion, national origin, sex, handicap or political beliefs; (b) equal access to programs and work assignments; (c) protection from personal abuse, corporal punishment, personal injury, disease, property damage and harassment; and, (d) freedom from reprisals or penalties as a result of seeking administrative or judicial redress.  All employees having direct contact with inmates must treat them respectfully and courteously.  All inmates shall have equal access to programs, activities and work assignments.  Id. at ¶ 9.

It is the policy of the Elmore County Sheriff's Department that members of the Elmore County Jail staff conduct themselves in a manner so as to ensure that inmates are dealt with in a

constitutional, honest, fair and impartial manner.   Members of the jail staff shall never intentionally demean or humiliate an inmate.  The critical discussion of staff members or inmates in the presence of any inmate is strictly forbidden.  Id. at ¶ 10.  It is further the policy of the Elmore County Sheriff's Department to identify and make treatment available for those inmates who are determined to be Human Immunodeficiency Virus (HIV)-positive or infected with Acquired Immune Deficiency Syndrome (AIDS) in a professional and confidential manner and to take precautions in seeking to protect other inmates and members of the jail from exposure to the virus.  Id. at ¶ 11.

It is the policy of the Elmore County Sheriff's Department that members of the jail staff receive and answer any written grievances or requests made by inmates to the Sheriff, Jail Administrator or jail personnel.  Id. at ¶ 12.  Inmates housed in the Elmore County Jail will be furnished with Inmate Request Forms for the purpose of stating their requests or grievances in writing.  Forms on which grievances and medical requests may be related to the jail staff are readily available in the jail.  Inmates are furnished these forms any time they request one.  Jail personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate.  An exception exists for requests of an emergency nature, which may be made orally.  Inmates are generally encouraged to resolve grievances between themselves and members of the jail staff informally. If this is not possible, the inmate may complete a request form, stating his grievance.  The original copy of an inmate's grievance and/or request form, containing the response of a jail official(s), is placed in an inmate's jail file.  Id. at ¶ 13.

Inmates are made aware of the grievance procedure and the medical request procedure by receipt of an inmate handbook at the time they are booked.  This handbook describes not only the

grievance process, but the general operation and rules of the jail.  Id. at ¶ 14.  Mr. Green did not

file a grievance regarding any of the allegations contained in his Complaint.  Id. at ¶ 15.

The cooler and meal trays provided to Mr. Green featured the phrase "black tie" in very

discreet, subtle lettering, not "all over it" as alleged by Mr. Green.  Mr. Green was provided

disposable utensils with which to eat his meals.  These practices are likely unnecessary from a

medical and health perspective; however, many inmates housed at the Elmore County Jail have

gross misconceptions about the transmission of infectious diseases such as HIV, AIDS, Hepatitis

A, B and C, and sexually transmitted diseases.  Inmates' misconceptions about these and other

illnesses lead them to believe that they can "catch" such illnesses from subsequent use of an

eating utensil, even if washed, or by drinking from the same water supply as an infected inmate.

As a result, inmates with conditions such as HIV and AIDS receive a designated water cooler

and meal tray and use disposable eating utensils so that other inmates do not believe that their

eating utensils or the meal tray on which their food is served were used previously by an inmate

with HIV or AIDS.  This practice is intended to preserve institutional order and security.  Id. at ¶

16.  Inmates usually maintain distance between themselves and those they consider

"contagious"; therefore, it is unlikely that inmates confined with Mr. Green attempted to

intimidate or threaten him.  Id. at ¶ 17.

Defendant Reaves denies that he violated, or authorized or allowed anyone to violate, any

provision of the Elmore County Jail Policy & Procedure Manual.  Ex. B (Reaves Decl.), ¶ 7.

Similarly, Defendant Reaves never observed any violation of the Elmore County Jail Manual of

Policies and Procedures.  Id.

## ARGUMENT

A.    **All Claims Against the Defendant in His Official Capacity Are Due to be Dismissed.**

     1.    <u>**All claims against the Defendant in his official capacity must fail based on Eleventh Amendment immunity.**</u>

Plaintiff's claims against Defendant Reaves in his official capacity are due to be dismissed for lack of subject matter jurisdiction, as such claims are barred by the Eleventh Amendment to the United States Constitution.  <u>Parker v. Williams</u>, 862 F.2d 1471, 1476 (11th Cir. 1989) (holding a sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); <u>Free v. Granger</u>, 887 F.2d 1552, 1557 (11th Cir. 1989) (holding that a sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); <u>Carr v. City of Florence, Ala.</u>, 916 F.2d 1521, 1525 (11th Cir. 1990) (holding a deputy sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); <u>Lancaster v. Monroe County</u>, 116 F.3d 1419, 1430-31 (11th Cir. 1997) (extending Eleventh Amendment immunity to include jailers employed by county sheriffs).[6]

     2.    <u>**All claims against the Defendant in his official capacity must fail because the Defendant is not a "person" under 42 U.S.C. § 1983.**</u>

The official capacity claims against Defendant Reaves are due to be dismissed because 42 U.S.C. § 1983 prohibits a <u>person</u>, acting under color of law, from depriving another of his rights secured by the United States Constitution.  42 U.S.C. § 1983 (emphasis added).  The United States Supreme Court has held that a state official, in his or her official capacity, is not a "person" under § 1983.  <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989).  Any

---

[6] To the extent Plaintiff's Complaint states, or attempts to state, any state law claim, this Defendant is entitled to absolute sovereign immunity to such claim(s).  <u>See</u> <u>Turquitt v. Jefferson County, Ala.</u>, 137 F.3d 1285, 1289 (11th Cir. 1998); <u>Ex parte Sumter County</u>, 2006 WL 2790036, *3 (Ala. September 29, 2006); <u>Ex parte Haralson</u>, 853 So. 2d 928, 932 (Ala. 2003); <u>Hereford v. Jefferson County</u>, 586 So. 2d 209, 210 (Ala. 1991); <u>Oliver v. Townsend</u>, 534 So. 2d 1038, 1044 (Ala. 1988).

claims against the Defendant in his official capacity should be dismissed because he is not a "person" under § 1983; as a result, all claims against him in his official capacity fail to state a claim upon which relief can be granted.  Id.; Carr, 916 F.2d at 1525 n.3.

> **B.     The Prison Litigation Reform Act Bars the Plaintiff's Complaint.**

Under the Prison Litigation Reform Act ("PLRA"), an inmate is required to exhaust all administrative remedies before instituting *any* action concerning prison conditions.  Woodford v. Ngo, 126 S. Ct. 2378, 2383 (2006) citing Porter v. Nussle, 534 U.S. 516, 524 (2002); see also 42 U.S.C. § 1997e(a); Porter, 534 U.S. at 532 ("the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes"); Johnson v. Meadows, 418 F.3d 1152, 1155 (11th Cir. 2005) (recognizing same); Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) (recognizing that § 1997e(a) mandates an inmate's exhaustion of all 'available' administrative remedies).

The PLRA's exhaustion requirement was intended by Congress to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  Porter, 534 U.S. at 525.  One of the benefits of the recently enunciated "proper exhaustion" interpretation is that it "improves the quality of those prisoner suits that are eventually filed because proper exhaustion often results in the creation of an administrative record that is helpful to the court."  Woodford, 126 S. Ct. at 2388.  The Supreme Court hypothesized that reasons for dodging the exhaustion requirement are varied, but observed that

> [o]ne can conceive of an inmate's seeking to avoid creating an administrative record with someone that he or she views as a hostile factfinder, filing a lawsuit primarily as a method of making some corrections official's life difficult, or perhaps even speculating that a suit will mean a welcome-if temporary-respite from his or her cell.

Id. at 2385 n.1. There can be little doubt that consistently enforcing the PLRA's complete exhaustion requirement "gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors." Id. at 2387-88.

In addition to the grievance procedure at the local level, Alabama law provides the opportunity to file a claim and proceed before the State of Alabama Board of Adjustment pursuant to Ala. Code § 41-9-60. Employees of the Elmore County Jail such as Defendant Reaves are state officers and are, therefore, entitled to sovereign immunity. See Lancaster, 116 F.3d at 1429. Because of this immunity from suit, the State of Alabama has provided an administrative remedy for the recovery of money damages through the State of Alabama Board of Adjustment.

Additionally, the PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of *physical injury*." 42 U.S.C. § 1997e(e) (West 2006) (emphasis added). "In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis." Mitchell v. Brown & Williamson Tobacco Corp, 294 F.3d 1309, 1312-13 (11th Cir. 2002) citing Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir. 1999) vacated and reinstated in part on reh'g, 216 F.3d 970 (11th Cir. 2000) (en banc); see also Tribe v. Snipes, 19 Fed. App. 325, 326 (6th Cir. 2001) (inmate's fear of attack by fellow inmates did not constitute physical injury for purposes of § 1997e(e)); Herman v. Holiday, 238 F.3d 660, 665-66 (5th Cir. 2001) (inmate failed to show requisite physical injury where he sought "money damages for 'emotional distress and mental anguish for fear of the unknown disease, such as the

deadly asbestos [sic]'."); <u>Allah v. Al-Hafeez</u>, 226 F.3d 247, 250-51 (3d Cir. 2000) (affirming dismissal of inmate's claims for compensatory damages for mental and/or emotional injury arising from alleged violation of his First Amendment right); <u>Davis v. District of Columbia</u>, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (affirming dismissal of HIV-positive inmate's claim for damages based only on emotional and mental distress).

The Plaintiff does not allege any physical injury as a result of his incarceration at the Elmore County Jail. The Plaintiff ignored the mandate of § 1997e(e) and asserts that he is free to pursue damages in the absence of physical injury under § 1983. <u>See</u> Plaintiff's Memorandum of Law, p. 5 (July 26, 2006). The Plaintiff cites <u>Daskalea v. District of Columbia</u>, 227 F.3d 433 (D.C. Cir. 2000) in support of his theory. Unlike the instant Plaintiff, the plaintiff in <u>Daskalea</u> had been released from custody by the time she initiated her suit and was, therefore, not subject to the PLRA. <u>Id.</u> The Plaintiff in the case at bar is very much subject to the PLRA, but cites no authority to justify his disregard for the "physical injury" requirement of § 1997e(e). Consequently, this action is due to be dismissed.

The Plaintiff briefly notes his exhaustion of "[a]ny administrative remedies that might have been required under the Prisoner Litigation Reform Act"; however, in the following sentence, he argues that because he "was in custody at the Elmore County Jail[] for a twenty four (24) hour period,…there was no possible way to exercise 'administrative remedies'." Complaint at ¶ 4. The Plaintiff's Inmate File contains no completed Inmate Request Forms. <u>See</u> Ex. A, Roberts Aff., ¶ 15.

Plaintiff's argument that because he "was in custody at the Elmore County Jail[] for a twenty four (24) hour period,…there was no possible way to exercise 'administrative remedies'" is equivalent to the argument that his compliance with administrative remedies would have been

futile under the circumstances.  The Eleventh Circuit Court of Appeals addressed this argument in Higginbottom v. Carter, 223 F.3d 1259 (11th Cir. 2000).  The court explicitly stated that "the exhaustion requirement cannot be waived based upon the prisoner's belief that pursuing administrative procedures would be futile."  Higginbottom, 223 F.3d at 1261; see also A.N.R. ex rel. Reed v. Caldwell, 111 F. Supp. 2d 1294, 1298 (M.D. Ala. 2000) (same).  This statement was bolstered by the court's holding in Alexander v. Hawk, 159 F.3d 1321 (11th Cir. 1998) in which it concluded that "the judicially recognized futility and inadequacy exceptions do not survive the new mandatory exhaustion requirement of the PLRA."  Alexander, 159 F.3d at 1325.  The Alexander court cautioned that "[s]ince exhaustion is now a pre-condition to suit, the courts cannot simply waive those requirements where they determine they are futile or inadequate."  Id. at 1326; see also Pri-Har v. Corrections Corp. of America, 154 Fed. Appx. 886, 888-89 (11th Cir. 2005) ("Because an administrative remedy does not have to be speedy, the absence of a time frame in which prison officials must respond to grievances does not per se satisfy the exhaustion requirement of § 1997e(a)."); Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999) ("we do not review the effectiveness of those remedies, but rather whether remedies were available and exhausted.") (citation omitted).

As a result of Plaintiff's admitted failure to exhaust all available remedies, he is barred from bringing this action under § 1997e(a).  See Alexander, 159 F.3d at 1326-27 (affirming dismissal of prison action due to failure to exhaust administrative remedies).  Under the authority of 42 U.S.C. § 1997e(c)(2), this Court also has the power to dismiss Plaintiff's claim(s) without first requiring the exhaustion of administrative remedies. ("In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the

underlying claim without first requiring the exhaustion of administrative remedies." 42 U.S.C. §

1997e(c)(2).). See Boxer X v. Harris, 437 F.3d 1107, 1110 n.2 (11th Cir. 2006) ("District courts

should first consider whether the PLRA bars a prisoner Plaintiff's suit prior to rendering a

decision on the merits. This is a prudential consideration, because the PLRA contemplates a

merits dismissal prior to a finding of exhaustion.").

> **C.    The Plaintiff's Requests for Injunctive and Declaratory Relief Are Due to be Denied as His Transfer from the Elmore County Jail Deprived Him of Standing to Seek These Types of Relief and Moots All Such Requests.**

The Plaintiff's requests for injunctive and declaratory relief are due to be dismissed as

such requests are moot. Alternatively, his requests for relief are due to be dismissed because the

Plaintiff does not provide any allegations to warrant the grant of such relief. As the Plaintiff

explains in his Complaint, he was confined at the Elmore County Jail for approximately twenty-

four (24) hours on February 21-22, 2006. See Complaint at ¶¶ 4, 6. At the end of this twenty-

four (24) hour period, the Plaintiff was transferred to Federal Prison Camp – Atlanta, where he is

presently incarcerated. Id. Clearly, he is no longer confined at the Elmore County Jail.

In McKinnon v. Talladega County, Ala., 745 F.2d 1360 (11th Cir. 1984), the court

recognized the "general rule…that a prisoner's transfer or release from a jail moots his individual

claim for declaratory and injunctive relief." Id. at 1363 citing Holland v. Purdy, 457 F.2d 802

(5th Cir. 1972). Since the Plaintiff was transferred from the Elmore County Jail to Federal

Prison Camp – Atlanta on or about February 22, 2006, his requests for injunctive and declaratory

relief are moot and due to be dismissed. See also Boxer X v. Donald, 169 Fed. Appx. 555, 559

(11th Cir. 2005) (requested injunctions against prison employees declared moot since plaintiff-

prisoner was no longer housed at that prison); Roque v. Armstrong, 392 F. Supp. 2d 382, 386-87

(D. Conn. 2005) (dismissing as moot prisoner's claims for injunctive relief under ADA).

In the event this Court determines that Plaintiff's requests for relief are not moot, his requests are nevertheless due to be denied as the Plaintiff's Complaint does not contain the minimum allegations necessary for injunctive relief to issue. "An injunction is a 'remedy potentially available only after a Plaintiff can make a showing that some independent legal right is being infringed – if the Plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise'." Alabama v. United States Army Corps of Engineers, 424 F.3d 1117, 1127 (11th Cir. 2005) quoting Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1098 (11th Cir. 2004). Specifically, a Plaintiff must show "(1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." United States Army Corps of Engineers, 424 F.3d at 1128 citing Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982) (relying on Rizzo v. Goode, 423 U.S. 362, 377 (1976) and Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506 (1959)).

The Plaintiff has not attempted to address any of these requisites in his Complaint. He must first establish the violation of the right(s) asserted in his complaint, which he has not and cannot do. The requested injunctive relief must pertain to the right of the Plaintiff that allegedly was (or is currently) being violated. Further, the Plaintiff does not have standing to seek injunctive relief on behalf of hypothetical future inmates "with the same medical disability as Plaintiff." Complaint at ¶ 43; see Dybczak v. Tuskegee Institute, 737 F.2d 1524, 1527 (11th Cir. 1984) quoting Gregory v. Litton Systems, Inc., 472 F.2d 631, 634 (9th Cir. 1972) (observing that "[t]he [Gregory] court expressly disapproved of 'injunctive benefits for nonparties [which are] neither incidental nor necessary to the resolution of the pending litigation'.").

The Plaintiff must demonstrate that there is no adequate remedy at law for the violation he allegedly suffered. The Plaintiff contends his rights were violated as a result of the disclosure of his HIV-positive status. Obviously, there are adequate remedies at law for the violation he allegedly suffered; examples include the causes of action alleged by the Plaintiff in this action.

It is clear that the injunctive relief sought by the Plaintiff – "[a] preliminary and permanent injunction ordering Defendant's [sic] from singling out, ostracizing and allowing [disclosure of] very private medical information…to occur" – is moot for several reasons under the circumstances. As mentioned above, the Plaintiff is no longer incarcerated at the Elmore County Jail. Therefore, he cannot be subject to alleged "singling out" or "ostracizing" in that facility. No issue is as moot as the Plaintiff's request for injunctive relief to prevent disclosure of "very private medical information." At this point, the Plaintiff's very private medical information has been disclosed. Perhaps more relevant is the fact that he has *not* demonstrated that he is likely to be harmed in the future by the same allegedly violative conditions. See Arnold v. Martin, 449 F.3d 1338, 1342 (11th Cir. 2006) ("We cannot fashion an injunctive order to remedy *future* harm because Arnold has not shown that she will likely suffer such harm."). In Cotterall v. Paul, 755 F.2d 777 (11th Cir. 1985), with respect to a transferred inmate's likelihood of being subject to allegedly unconstitutional jail conditions in the future, the court said: "[t]he most that can be said is that if Cotterall is again incarcerated in a minimum security facility and again charged with a disciplinary infraction, he might again be transferred to Coffee County jail. This is too speculative." Id. at 780; see also City of Los Angeles v. Lyons, 461 U.S. 95, 104 (1983); McKinnon, 745 F.2d at 1363 quoting Dudley v. Stewart, 724 F.2d 1493, 1494 (11th Cir. 1984).

The Plaintiff's request for injunctive relief is entirely without merit. The transfer of the Plaintiff to Federal Prison Camp – Atlanta rendered his request for injunctive relief moot. Additionally, the Plaintiff has failed to present allegations sufficient to permit this Court to grant the Plaintiff's request. Because the Plaintiff's request for injunctive relief is moot and because he failed to set out the requisite allegations necessary to justify the grant of injunctive relief, his requests are due to be denied.

        **D.**        **Alternatively, the Defendant is Entitled to Summary Judgment Based on Qualified Immunity Because His Conduct Violated No Constitutional Right and No Aspect of His Conduct Crossed a "Bright Line" Contour of Clearly Established Constitutional Law.**

Defendant Reaves was acting within his discretionary authority as an employee of the Elmore County Jail during all times relevant to Plaintiff's Complaint because all of his actions were taken in furtherance of his job duties.[7] See, e.g., Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-67 (11th Cir. 2004). Once a defendant has asserted the defense of qualified immunity and shown that he was acting within his discretionary authority, the threshold inquiry a court must undertake is whether the Plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). This initial inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The second inquiry is, if a constitutional violation is stated, were these rights "clearly established" to the degree that a defendant had "fair warning" that his or her conduct violated the Plaintiff's constitutional rights? Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).

---

[7] See Greffey v. State of Ala. Dep't of Corrections, 996 F. Supp. 1368, 1380 (N.D. Ala. 1998) ("The primary distinction between the deliberate indifference test discussed here, and the qualified immunity analysis addressed hereafter, is this: the test for deliberate indifference involves a subjective component, while qualified immunity scrutiny invokes only an objective reasonableness inquiry.").

In making an assessment of whether the particular conduct of this Defendant was clearly established as being violative of constitutional dictates, the reviewing court must examine the state of law at the time the alleged deprivation occurred.  See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994).  A constitutional right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); Lancaster, 116 F.3d at 1424.  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 n.4 (11th Cir. 1997) (en banc) (citations omitted).

Assuming, *arguendo*, that the Plaintiff could demonstrate a constitutional violation, he must still show that clearly established law provided the Defendant with fair warning that his conduct was unlawful.  The Plaintiff may do so by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision are specific enough to demonstrate conduct was illegal, even in the total absence of case law.  Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted).  The Eleventh Circuit has identified the latter method as an "obvious clarity" case.  Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted).  In order to show that the conduct of the defendant was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent."  Willingham, 321 F.3d at 1301.  "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government

actor has immunity from suit." <u>Storck</u>, 354 F.3d at 1318 (quoting <u>Lassiter v. Alabama A&M University, Bd. of Trustees</u>, 28 F.3d 1146, 1149 (11th Cir. 1994) (overruled on other grounds).

Plaintiff cannot meet his burden of demonstrating a constitutional violation or showing that clearly established law provided Defendant Reaves with fair warning that his conduct was unlawful.  Therefore, Defendant Reaves is entitled to qualified immunity.

1.    **Privacy rights (HIPAA) claim.**

The Plaintiff's attempt to state a claim for violation of his privacy rights fails for at least two reasons.  First, even though no private right of action exists under the Health Insurance Portability and Accountability Act (HIPAA), the Plaintiff fails to state a claim for violation of his privacy rights under *any* source of privacy rights.  Second, assuming, *arguendo*, the Plaintiff was able to state a claim for violation of his privacy rights, the Eleventh Circuit Court of Appeals' decision in <u>Harris v. Thigpen</u>, 941 F.2d 1495 (11th Cir. 1991) is directly on point and established that the disclosure of an inmate's HIV-positive status does ***not*** constitute a violation of his or her privacy rights.

At the outset, it is especially important to note that federal courts in Alabama and elsewhere have concluded that the HIPAA does not create a private right of action.  In <u>Means v. Independent Life and Acc. Ins. Co.</u>, 963 F. Supp. 1131 (M.D. Ala. 1997), the question before the court was "whether the HIPAA merely preempts state law by establishing the definition of 'duplicative', or whether it *creates an independent and exclusive federal cause of action*." <u>Means</u>, 963 F. Supp. at 1135 (emphasis added).  With respect to this issue, the court observed that "the Defendants have failed to point to any, and the court finds no, evidence of congressional intent to create a private right of action under the HIPAA." <u>Id.</u> (citation omitted); <u>see also</u> <u>Runkle v. Gonzalez</u>, 391 F. Supp. 2d 210, 237 (D.D.C. 2005) (no private cause of action

exists under HIPAA); <u>Univ. of Colorado Hosp. Auth. v. Denver Publishing Co.</u>, 340 F. Supp. 2d 1142, 1144-45 (D. Colo. 2004) (finding no evidence that Congress intended to create a private right of action under HIPAA); <u>Brock v. Provident Am. Ins. Co.</u>, 144 F. Supp. 2d 652, 657 (N.D. Tex. 2001) (same); <u>Wright v. Combined Ins. Co. of Am.</u>, 959 F. Supp. 356, 363 (N.D. Miss. 1997) (same).  Consequently, the Plaintiff cannot state a claim for violation of his privacy rights under the HIPAA and these allegations are due to be dismissed.

Regardless of the source of the privacy right asserted by the Plaintiff, the law of the Eleventh Circuit is clear that an inmate's constitutional privacy rights are not violated where execution of a correctional facility's policy results in disclosure of an inmate's HIV-positive or AIDS status.  This issue was squarely before the Eleventh Circuit Court of Appeals in <u>Harris v. Thigpen</u>, 941 F.2d 1495 (11th Cir. 1991).  In <u>Harris</u>, the court reviewed, *inter alia*, the district court's conclusion that disclosure of the identity of HIV-positive and AIDS-infected inmates, which resulted when such inmates were segregated from the general population, was reasonably related to legitimate penological interests.  <u>See</u> <u>Harris v. Thigpen</u>, 727 F. Supp. 1564, 1580-81 (M.D. Ala. 1990).  After deciding that "seropositive prisoners enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnoses to other inmates, as well as to their families and other outside visitors to the facilities in question," the Eleventh Circuit Court of Appeals subjected the facts of the case to the test set out in <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987) ("when a prison regulation or policy 'impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests'.").

The <u>Harris</u> court discussed many of the decisions cited by the Plaintiff in the case at bar before concluding that,

> [t]o the extent that the segregation policy encroaches upon the privacy rights of HIV-positive inmates, it is a ***reasonable infringement in light of the inmate interests at stake*** (both seropositive and general population), and the difficult decisions that the DOC must make in determining how best to treat and control within Alabama correctional facilities the spread of a communicable, incurable, always fatal disease.

Harris, 941 F.2d at 1521 (emphasis added).  In arriving at this conclusion the court considered such information as the district court's observation that

> [i]t appears to this Court that the Plaintiffs in this case selfishly assert their rights to expose other inmates to their problems independent of any right of the other inmates to be protected from what is admitted to be a dread fatal disease of the Plaintiffs (all of whom are capable of transmitting the disease). This Court must consider the rights of the general population inmates in determining whether or not the policies in question are constitutionally permissible.

Id. at 1515 quoting Harris, 727 F. Supp. at 1572.  The court recognized that behavior likely to contribute to transmission of HIV – e.g., homosexual relations, IV drug use, tattooing and ear piercing – "occurs disproportionately in prison systems" and that "Alabama is no exception." Harris, 941 F.2d at 1519.

Based on this holding in Harris, supra, it is clear that any privacy rights retained by the instant Plaintiff were not violated by providing him a designated cooler and meal tray.[8]  In fact, a policy like the one alleged in this case would be *more* likely to withstand scrutiny under the Turner test than the one that was the subject of, and approved by, the Harris litigation.  First, providing one HIV-positive inmate with a designated cooler and meal tray is far less restrictive than a policy of segregating such inmates from the general population entirely.  The Plaintiff complained of being denied a cellmate; however, his complete segregation from the general population would likely have proven even less pleasant in his view.

---

[8] As discussed above, the provision to the Plaintiff of a "scarlet red medical scrub outfit" was completely unrelated to his HIV-positive status.  Federal prisoners and detainees are issued a red uniform so that they may be identified as such.  See Ex. A, Roberts Aff., ¶ 6.

When addressing the final factor of the <u>Turner</u> test – i.e., "the existence of 'obvious, easy alternatives' may be considered as evidence that a prison restriction is not reasonable, but merely 'an 'exaggerated response' to prison concerns'," <u>Harris</u>, 941 F.2d at 1519, the court decided with respect to the policy of segregation that, "[g]iven the distressingly high stakes,…we do not think that the evidence in the record is so substantial as to indicate that the DOC's conservative approach is an 'exaggerated response' to the presence of the disease." <u>Harris</u>, 941 F.2d at 1520. In other words, the court did not consider a policy under which HIV-positive and AIDS-infected inmates were permitted to mingle with the general population a sufficiently viable alternative to the absolute segregation policy challenged by the Plaintiffs in <u>Harris</u>.

Second, in evaluating the segregation policy under the first factor of the <u>Turner</u> test – i.e., "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," <u>Harris</u>, 941 F.2d at 1516 <u>quoting</u> <u>Turner</u>, 482 U.S. at 89 (quoting <u>Block v. Rutherford</u>, 468 U.S. 576, 586 (1984)), the court conceded that

> [e]ven if Alabama's approach in this case is now a minority position among state correctional systems, we simply are unable to say at this point that the DOC's use of combined mass screening and segregation is so remotely connected to the legitimate goals of reducing HIV transmission and violence within the state's penal system 'as to render the policy arbitrary or irrational'.

<u>Harris</u>, 941 F.2d at 1517 <u>quoting</u> <u>Turner</u>, 482 U.S. at 89-90.

Again, it is obvious that the court considered and rejected the Plaintiffs' alternative proposal "urging that the needs of seropositive prisoners are best served by…integrating HIV-positive prisoners into the general prison population, and by implementing an 'appropriate AIDS education and counseling program, along with appropriate security measures and classification of prisoners'." <u>Harris</u>, 941 F.2d at 1517 (citation omitted).  It is instructive that the <u>Harris</u> court declined to endorse, as a more adequate alternative, a policy advocating the integration of HIV-

positive inmates into the general population and the implementation of "an 'appropriate AIDS education and counseling program, along with appropriate security measures and classification of prisoners'." Id. Ironically, the instant Plaintiff alleges that a similar integration policy at the Elmore County Jail violated his privacy rights.

In issuing a designated cooler and meal tray and disposable eating utensils to HIV-positive inmates, Elmore County Jail officials preserve institutional order and security.[9] These practices are likely unnecessary from a medical and health perspective[10]; however, many inmates housed at the Elmore County Jail have gross misconceptions about the transmission of infectious diseases such as HIV, AIDS, Hepatitis A, B and C, and sexually transmitted diseases. Inmates' misconceptions about these and other illnesses lead them to believe that they can "catch" such illnesses from subsequent use of an eating utensil, even if washed, or by drinking from the same water supply as an infected inmate. See Ex. A, Roberts Aff., ¶ 16. Through these practices, jail officials promote harmony and civility among inmates.

Although Elmore County Jail corrections officers could have opted not to issue the Plaintiff a specially designated cooler and meal tray upon discovering the Plaintiff's HIV-positive status,[11] these corrections officers have a responsibility to protect inmates under their

---

[9] Significantly, the Plaintiff does *not* allege that Defendant McCoy was responsible for providing him with the "Black Tie" thermos and food tray or the disposable utensils and garbage bag. See Complaint at ¶¶ 27, 36, 37; Declaration of Plaintiff (Doc. 7-2).

[10] But see Rish v. Johnson, 131 F.3d 1092, 1100 (4th Cir. 1997) ("As with other infectious and communicable diseases, HIV can *theoretically,* be spread by direct contact with contaminated substances, items or surfaces.") (statement excerpted from the affidavit of Dr. Charles B. Hicks, M.D., Assistant Professor of Medicine in the Department of Medicine, Division of Infectious Diseases, of the Duke University Medical Center); U.S. Dep't of Labor, Occupational Safety & Health Administration (OSHA), Regulation 1910.1030(d)(2)(xiii) (Bloodborne pathogens – Engineering and Work Practice Controls) (29 C.F.R. § 1910.1030(d)(2)(xiii)) ("Specimens of blood or other potentially infectious materials shall be placed in a container which prevents leakage during collection, handling, processing, storage, transport, or shipping.").

[11] With respect to the DOC's decision to test and segregate HIV-positive inmates, the Harris court commented that "it represents precisely the type of urgent problem of prison reform and prison administration with which we as a court are 'ill equipped to deal'." Harris, 941 F.2d at 1521 quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974). See also Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("[p]rison administrators…should be accorded wide-ranging

care against potential harms of which they are aware.  See Farmer v. Brennan, 511 U.S. 825, 833-34 (1994); see also Helling v. McKinney, 509 U.S. 25, 33 (1993) ("Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms."); Hutto v. Finney, 437 U.S. 678, 682 (1978) (where inmates "were crowded into cells and…some of them had infectious maladies such as hepatitis and venereal disease[,]…the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed."); Anderson v. Romero, 72 F.3d 518, 521 (7th Cir. 1995) ("There is a great difference, so far as the balance between privacy and public health is concerned, between a communicable and a noncommunicable disease….[A] person with a communicable disease is a danger to others"); Jones v. Diamond, 594 F.2d 997, 1016 (5th Cir. 1979) ("It is only when the officials fail to protect prisoners from homosexual attacks, personal violence, or *unnecessary contact with the contagiously ill* that the federal courts are warranted in entering the classification picture.") (citation omitted) (emphasis added).  Once the Plaintiff informed Defendant Reaves of his "disorder" – i.e., HIV – jail officials had an obligation to protect, to the extent possible, staff and other inmates confined at the Elmore County Jail from the threat posed by the Plaintiff.  See Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996) ("we have previously held that correctional officials have an affirmative obligation to protect inmates from infectious disease"); Billman v. Indiana Dep't of Corrections, 56 F.3d 785, 788-89 (7th Cir. 1995) (stating that if the jail official responsible for assigning inmates to cells knew that inmate occupying cell to which Plaintiff was assigned had a propensity to rape his cellmates and was HIV-positive and did not give Plaintiff

deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

the opportunity to reject the assignment, such official would be deliberately indifferent to the consequences and liable to plaintiff in damages); <u>Dunn v. White</u>, 880 F.2d 1188, 1196 (8th Cir. 1989) ("regardless whether the prison has a constitutional obligation to do so, it has an interest in making an extra effort to protect prisoners from a fatal disease"); <u>Wilson v. Lynaugh</u>, 878 F.2d 846, 849 (5th Cir. 1989) (the law of the Fifth Circuit recognizes "that conditions of confinement which expose inmates to communicable diseases and identifiable health threats implicate the guarantees of the Eighth Amendment").

The practice of providing the Plaintiff a designated cooler and meal tray had the added effect of making inmates and staff aware of the danger he presented. Such conduct has been expressly approved not only in the Eleventh Circuit, but in other circuits as well. <u>See</u>, <u>e.g.</u>, <u>Tokar v. Armontrout</u>, 97 F.3d 1078, 1084 (8th Cir. 1996) (affirming grant of qualified immunity to prison officials who allegedly violated Plaintiff's privacy rights by segregating him in AIDS unit); <u>Anderson</u>, 72 F.3d at 525-26 (holding that warnings as to the threat posed by a particular HIV-positive inmate "do not violate the Constitution just because they are ad hoc"); <u>Moore v. Mabus</u>, 976 F.2d 268, 271 (5th Cir. 1992) (finding plaintiff-inmate's right of privacy and loss of privileges Fourteenth Amendment due process and equal protection claims to be without merit and stating that "the identification and segregation of HIV-positive prisoners obviously serves a legitimate penological interest"); <u>see also</u> <u>Fambro v. Fulton County, Ga.</u>, 713 F. Supp. 1426, 1429 (N.D. Ga. 1989) ("Without screening by medical personnel, the placement of incoming unscreened inmates creates a substantial hazard for the unnecessary transmission of serious or lethal communicable diseases.").

It is imperative that inmates and staff alike be aware that a particular inmate is HIV-positive. Where segregation of HIV-positive inmates from the general population is not

possible, inmates need to at least be aware of the inmates among them who are HIV-positive so that high-risk behavior with such individuals can be avoided.  See Harris, 941 F.2d at 1519-20 ("The parties agree that under any system of prison administration, the elimination of high risk behavior, such as homosexual activity or IV drug use, is impossible.").  If segregation is not an option at an institution, avoidance of HIV-positive inmates may be impossible.  The following excerpt from Harris, supra, persuasively demonstrates this point:

> [A]ssume that nonviolent seropositive prisoner A is integrated into the general prison population because he appeared to pose no direct threat of HIV transmission. A is raped by inmate B, who as a result contracts HIV. B later forcibly rapes C, further transmitting the disease.
>
> In the above example, education, as urged by appellants, would alert B to the risk, and would teach him the deadly consequences of his behavior. But suppose B ignores the risk. The above scenario consequently yields not only B, a prisoner who has contracted the disease through his own maliciousness or folly (by ignoring AIDS education), but also C, a completely faultless prisoner whose punishment for whatever crime has now in effect been increased to a sentence of certain death. A, who apparently posed no direct behavioral threat, has nevertheless become an agent for further transmission of the disease in the general population.
>
> Although the prison obviously has a responsibility to use its best efforts to prevent the attacks upon A and C, as the parties have acknowledged, no system is perfect. Moreover, it is virtually certain that the next lawsuit will be *C v. DOC,* with C contending that the prison is liable for his harm, since it knew, or should have known, that A was infected with a contagious, deadly disease, and that even under the best circumstances the system could not guarantee that C would not be raped.

Harris, 941 F.2d at 1520; see also "Rape and AIDS in Prison: On a Collision Course to a New Death Penalty," 30 Suffolk U. L. Rev. 863, 900-901 (1997); "Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of *Wilson v. Seiter*," 44 Stan L. Rev. 1541, 1578-81 (1992).

Identification of HIV-positive inmates is critical to corrections officers as well.  If corrections officers are aware that a bleeding inmate or an inmate needing medical attention is

HIV-positive, they can take the necessary precautions before engaging that individual. See Harris, 941 F.2d at 1518 n.34 ("Warden White also expressed concern that there would be a much higher turnover in the number of correctional officers at Limestone if seropositive prisoners were reintegrated without their identities being revealed to correctional staff."). Simply put, identification and segregation of HIV-positive and AIDS-infected inmates is the "best practice" policy; but, when segregation is not possible, the next best option is to identify HIV-positive and AIDS-infected inmates to all other inmates and staff.

Additionally, the Plaintiff alleges that he "was forbidden to have a cell mate." Complaint at ¶ 30. Assuming, *arguendo*, the truth of this statement, again, such a policy is consistent with the legitimate penological objective of protecting other inmates from the threat posed by the Plaintiff. See Elizabeth Kantor, M.D., "HIV Transmission and Prevention in Prisons," HIVInsite Knowledge Base Chapter, University of California San Francisco (April, 2006) available at http://hivinsite.ucsf.edu/InSite?page=kb-07-04-13#S4X, accessed October 20, 2006 ("Housing more than 1 inmate per cell, common now in crowded institutions, is a major contributing factor to incidents of violence and sexual assault."); Anderson, 72 F.3d at 524 explaining its holding in Billman, 56 F.3d 785, 788-89 ("the knowing failure to protect an inmate from the danger posed by an HIV-positive cellmate with a propensity to rape violates the inmate's right not to be subjected to cruel and unusual punishments."). Moreover, there is no protected interest in having a cellmate. See, e.g., Neal v. Fairman, 69 F.3d 539 (7th Cir. 1995) citing Hewitt v. Helms, 459 U.S. 460, 467-68 (1983) ("A prisoner has no liberty interest in remaining in the general prison population."); St. Hilaire v. Arizona Dep't of Corrections, 934 F.2d 324, *2 (9th Cir. 1991) (recognizing that "deliberately forcing an inmate to share his cell with a sexually aggressive, violent, or very ill AIDS carrier might constitute a 'deliberate indifference' claim"); Sanders v.

St. Louis County, 724 F.2d 665, (8th Cir. 1983) citing Olim v. Wakinekona, 461 U.S. 238 (1983) ("an inmate normally has no liberty interest in where he is housed.").

It is clear that the disclosure of the Plaintiff's HIV-positive status, whether intentional or unintentional, was at least reasonably related to multiple legitimate penological objectives. Jail officials furthered the legitimate penological objective of preserving institutional order and security by issuing the Plaintiff a designated cooler and meal tray and disposable eating utensils. Through this same conduct jail officials also furthered the legitimate penological objective of notifying inmates and staff of the risk represented by the Plaintiff. The practice's satisfaction of these legitimate penological objectives outweighs any privacy interest retained by the Plaintiff. See Hudson v. Palmer, 468 U.S. 517, 528 (1984) ("We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security."); Dunn, 880 F.2d at 1196 ("In light of the seriousness of the disease and its transmissibility, we conclude….that the prison's substantial interest outweighs plaintiff's expectation of privacy.").

In summary, the Plaintiff's attempt to state a claim under the HIPAA for violation of his privacy rights is due to be dismissed for at least two reasons. First, the HIPAA does not provide a private cause of action for disclosure of protected health information. Second, the Eleventh Circuit Court of Appeals, as well as other Courts of Appeals, have plainly held that an inmate's privacy interest in non-disclosure of his or her HIV-positive status is outweighed by a correctional facility policy designed to satisfy legitimate penological objectives (e.g., protecting inmates and guards against exposure to HIV). See Harris, 941 F.2d at 1521; Tokar, 97 F.3d at 1084; Anderson, 72 F.3d at 525-26; Moore, 976 F.2d at 271; Dunn, 880 F.2d at 1196. Based on these grounds, the Plaintiff's attempt to state a claim under the HIPAA for disclosure of his HIV-

positive status is due to be dismissed.  Alternatively, Defendant Reaves is entitled to judgment in his favor as a matter of law based on qualified immunity.

### 2.    Americans with Disabilities Act claim.

The Plaintiff vaguely asserts that his rights under the Americans with Disabilities Act (ADA) were violated during his brief incarceration at the Elmore County Jail.  He comes closest to specifying the nature of this alleged transgression when he contends that the events he describes in his Complaint violated his "right to be treated equally under the("A.D.A.") [sic], Americans with Disabilities Act."   Complaint at ¶ 41.  The Plaintiff's attempt to state a claim against this Defendant in his individual capacity for violation of Plaintiff's rights under the ADA is due to be dismissed as there is no individual capacity liability under Title II of the ADA.  His attempt to state a claim against this Defendant is additionally due to be dismissed for the reasons set out below.

Although the Plaintiff does not identify a particular portion of the ADA on which he bases his claim, it is reasonable to assume that he is proceeding pursuant to 42 U.S.C. § 12132, also known as Title II of the ADA.  Title II of the ADA prohibits discrimination against a "qualified individual with a disability" by a public entity and provides, in pertinent part: "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  "To state a claim under Title II of the ADA, a Plaintiff must allege: (1) that he is a 'qualified individual with a disability'; (2) that he was 'excluded from participation in…denied the benefits of the services, programs, or activities of a public entity'

or otherwise 'discriminated [against] by such entity'; (3) 'by reason of such disability'." Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) citing 42 U.S.C. § 12132.

With respect to the Plaintiff's attempt to state a claim against Defendant Reaves in Reaves' individual capacity, it is unnecessary to determine whether or not the Plaintiff has successfully stated such a claim since there is no individual capacity liability under Title II of the ADA. See Badillo v. Thorpe, 158 Fed. App. 208, 211 (11th Cir. 2005) citing Garcia v. S.U.N.Y. Health Services Center of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) ("To the extent that Badillo seeks to hold Benefiel personally liable, there is no individual capacity liability under Title II of the ADA or RA."); Dukes v. Georgia, 428 F. Supp. 2d 1298, 1322 n.5 (N.D. Ga. 2006) ("Only Defendant Coweta County can be liable for any alleged violations as there is no individual liability under either the ADA or Rehabilitation Act.") (citation omitted).  Since the Plaintiff also sued this Defendant in his official capacity, this memorandum brief will now evaluate whether a claim was stated under Title II of the ADA against Defendant Reaves in his official capacity.[12]

First, the Plaintiff does not specifically allege that he is a "qualified individual with a disability" and it is debatable whether or not he satisfies this first element.  See Bragdon v. Abbot, 524 U.S. 624, 641 (1998) ("Respondent's HIV infection is a physical impairment which substantially limits a major life activity, as the ADA defines it."); cf. Dukes, 428 F. Supp. 2d at 1323 n.6 citing Waddell v. Valley Forge Dental Associates, Inc., 276 F.3d 1275, 1279 n.4 (11th Cir. 2001) ("the Eleventh Circuit has intimated that HIV status should not be considered a disability per se and that disability must be determined on an individual case-by-case basis.").  "A ''qualified individual with a disability' is defined as 'an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural,

---

[12] "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. Brandon v. Holt, 469 U.S. 464, 471…(1985).  As such, it is no different from a suit against the State itself."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity'." United States v. Georgia, 126 S. Ct. 877, 879 (2006) quoting 42 U.S.C. § 12131(2).  In addition to not alleging that he is a "qualified individual with a disability," the Plaintiff does not explain how *his* "HIV infection is a physical impairment which substantially limits a major life activity." Bragdon, 524 U.S. at 641.  Indeed, no where in his Complaint does he mention the substantial limitation of a major life activity brought about by *his* HIV infection.  In light of these omissions, the Plaintiff has not demonstrated that he is a "qualified individual with a disability." 42 U.S.C. § 12132.

Second, the Plaintiff's Complaint is devoid of allegations tending to show that "that he was 'excluded from participation in or…denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity'." Shotz, 256 F.3d at 1079 citing 42 U.S.C. § 12132.  A brief review of the Complaint reveals that he was afforded all "the benefits of the services, programs, or activities" available to inmates at the Elmore County Jail. See, generally, Complaint.  In response to the purported humiliation suffered by the Plaintiff and his desire to invoke the ADA as a remedy for this personal affront, it is worth noting that the Eleventh Circuit Court of Appeals "has repeatedly stated that the civil rights laws were not intended to be a 'civility code'." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2001).  Jails and prisons are not known as hospitable places, nor are they known as a refuge for well-mannered individuals. See Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 132 (1977) citing Wolff v. McDonnell, 418 U.S. 539, 561-562 (1974) ("Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration.").

If the Plaintiff in fact experienced the events he describes, it is unfortunate. However, as stated in his Complaint, he was confined at the Elmore County Jail for, at most, one day. See Complaint at ¶ 4. Assuming, *arguendo*, the truth of the Plaintiff's allegations, it is important to realize that he was *not* subjected to such conditions for one month or even one week; he was at the Elmore County Jail for twenty-four (24) hours or less. Surely the Plaintiff can endure one day of unfriendly fellow inmates and emerge without his feelings hurt.[13] See Hutto, 437 U.S. at 686-87 ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.").

Moreover, the conduct of which the Plaintiff principally complains cannot be attributed to Defendant Reaves or any Elmore County Jail official. The discrimination to which the Plaintiff was supposedly subject was a result of his fellow *inmates'* treatment of him, not the conduct of jail officials and especially not that of the Defendant. More pointedly, the allegations in the Complaint describe the subjective emotional experiences of the Plaintiff. As mentioned above, he does not allege that he was "'excluded from participation in or…denied the benefits of the services, programs, or activities of a public entity'." Shotz, 256 F.3d at 1079 citing 42 U.S.C. § 12132. The gist of his ADA claim is that other inmates were not nice to him. Once again, "the civil rights laws were not intended to be a 'civility code'." Higdon, 393 F.3d at 1220. This point carries particular weight in the context of a jail environment as compared to an individual's place of employment.

Finally, the Plaintiff insinuates, but never argues outright, that the provision to him of "the scarlet red medical scrub outfit," "Black Tie" thermos and "Black Tie" dinner tray was the

---

[13] "Hurt feelings" is the extent of "injury" that may be alleged by the Plaintiff as there is no suggestion of physical injury. The Plaintiff apparently concedes this fact by arguing for the appropriateness of an award in the absence of physical injury. See Plaintiff's Memorandum of Law (Doc. 2), p.5 (July 26, 2006).

result of his alleged disability (i.e., HIV-positive status).[14]  He does not allege that any jail official ever told him, or otherwise indicated, that he was provided these items solely because he is HIV-positive.  Indeed, Plaintiff was issued a red jail uniform because of his status as a federal prisoner, not because of his HIV-positive status.  See Ex. A (Roberts Aff.), ¶ 6; Ex. B (Buggs Decl.), ¶ 5; Ex. C (McCoy Decl.), ¶ 5.  The Plaintiff also fails to allege that he ever tried to discuss his unease with any jail official, much less the Defendant.  Elmore County Jail officials are not clairvoyant; they cannot rectify discrimination allegedly encountered by the Plaintiff unless they are made aware of such behavior.  The Plaintiff does not contend that he brought his supposed discriminatory treatment to the attention of Defendant Reaves or any other jail official.[15]  As a result, he has not satisfied the third element necessary to state a claim under Title II of the ADA.[16]  See Gaston v. Bellingrath Gardens and Home, Inc., 167 F.3d 1361, 1363-64 (11th Cir. 2001) (plaintiff's failure to demand a reasonable accommodation is "fatal" to her ability to prevail on her claim of discrimination); Wood v. President and Trustees of Spring Hill College in the City of Mobile, 978 F.2d 1214, 1222 (11th Cir. 1992) (failure to instruct jury as to reasonable accommodation was not reversible error since Plaintiff "never alleged, much less established, that she demanded any reasonable academic accommodations from the college because of her handicap.").

---

[14] Again, it is worth noting that the Plaintiff does *not* allege that Defendant McCoy was responsible for providing him with the "Black Tie" thermos and food tray or the disposable utensils and garbage bag.  See Complaint at ¶¶ 27, 36, 37; Declaration of Plaintiff (Doc. 7-2).

[15] Even if the Plaintiff had brought his treatment to the attention of jail officials and they ignored his requests, such failure to act on their part would likely *not* be considered unconstitutional.  See Bd. of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 367 (2001) ("Although ['"negative attitudes' or 'fear'"] may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make….[T]he result of *Cleburne* [i.e., City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432 (1985)] is that States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational.").

[16] This issue is also relevant to the Plaintiff's failure to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA).

To the extent the Plaintiff bases his ADA claim on the alleged disclosure of his status as HIV-positive, such a theory will not support a claim under the ADA. In <u>Dukes v. Georgia</u>, 428 F. Supp. 2d 1298 (N.D. Ga. 2006), an inmate sued numerous Defendants including the State of Georgia, Coweta County, the sheriff of Coweta County and several of the sheriff's deputies alleging, *inter alia*, the violation of his rights under the ADA and the Rehabilitation Act of 1973. The violation of the inmate's rights under the ADA and the Rehabilitation Act of 1973 supposedly occurred when one or more of the defendant sheriff's deputies disclosed the inmate's HIV-positive status to other inmates. The court quickly resolved this issue in favor of the defendants by explaining that the Plaintiff "has not argued that this disclosure denied him the benefits of any program or service or that it discriminated against him. Therefore, the court concludes that the officer's disclosure violated neither Title II of the ADA nor the Rehabilitation Act." <u>Dukes</u>, 428 F. Supp. 2d at 1323. Thus, to the extent the Plaintiff bases his ADA claim on the alleged disclosure of his HIV-positive status to those in the Elmore County Jail, such claim must fail.

For the foregoing reasons, the Plaintiff has not stated a claim against Defendant Reaves in Reaves' individual or official capacity for violation of his rights under the ADA. Consequently, these allegations are due to be dismissed; alternatively, this Defendant is entitled to judgment in his favor as a matter of law based on qualified immunity.

Even if the Plaintiff can be said to have stated a claim for violation of his rights under the ADA – which he cannot, the Defendant is likely entitled to Eleventh Amendment immunity to such claim(s). The ADA features a provision – 42 U.S.C. § 12202 – which expressly abrogates Eleventh Amendment immunity typically granted States. That provision states, in pertinent part: "A State shall not be immune under the eleventh amendment to the Constitution of the United

States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. In the midst of wide-ranging disagreement about the applicability of 42 U.S.C. § 12202 to certain claims, the United States Supreme Court decided <u>United States v. Georgia</u>, 541 U.S. 151, 126 S. Ct. 877 (2006). In <u>United States v. Georgia</u>, the Court held "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." <u>Id.</u> at 882; <u>see also</u> <u>Leverette v. Alabama Revenue Dep't</u>, 453 F. Supp. 2d 1340, 1343-44 (M.D. Ala. 2006) (concluding that "because, with Title I, Congress did not validly abrogate sovereign immunity with regard to state-employment discrimination against the disabled, Congress did not do so with Title II either").

Harris v. Thigpen, <u>supra</u>, held that no Fourteenth Amendment privacy rights of Plaintiff-inmates were violated by the disclosure of their status as HIV-positive or AIDS-infected – a byproduct of the DOC's policy of segregating such inmates from the general population. <u>Harris</u>, 941 F.2d at 1498, 1521. More generally, though, "when a prison regulation or policy 'impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests'." <u>Id.</u> at 1515 <u>quoting</u> <u>Turner</u>, 482 U.S. at 89. Assuming, *arguendo*, that a policy exists at the Elmore County Jail pursuant to which an HIV-positive inmate is issued a designated cooler and meal tray and given disposable eating utensils, there can be little doubt that such a policy is reasonably related to legitimate penological interests such as preserving institutional order and security and making inmates and staff aware of the specific threat of HIV. These legitimate penological interests are consistent with the obligations of jail officials to provide a safe, well-run facility and to protect inmates from known hazards. Since the Plaintiff did not experience, much less allege, a violation of rights guaranteed by the Fourteenth

Amendment, Title II does *not* validly abrogate the Defendant's Eleventh Amendment immunity. Therefore, as there was no *actual* violation of Plaintiff's Fourteenth Amendment rights, his attempt to state a claim against this Defendant is barred by their Eleventh Amendment immunity.

Based on the foregoing, it is clear that no Defendant violated the Plaintiff's rights under the Americans with Disabilities Act.  Further, the Plaintiff cannot show that clearly established law provided this Defendant with fair warning that his conduct was unlawful.  If anything, clearly established law provided the Defendant fair warning that his conduct was entirely *lawful*. Therefore, Defendant Reaves is entitled to qualified immunity on the Plaintiff's Americans with Disabilities Act claim.

### 3.    Cruel and Unusual Punishment claim.

The Plaintiff fails to state a claim that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment.  He lists Cruel and Unusual Punishment as "Ground Three" of his Complaint, but does not explain in either his Complaint or Memorandum of Law how his allegations state a claim for cruel and unusual punishment.  See Complaint at p. 3.

The United States Supreme Court has noted that "[a]fter incarceration, only the ''unnecessary and wanton infliction of pain','' constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Ingraham v. Wright, 430 U.S. 651, 670 (1977) quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  Correctional facilities are not widely known for housing the most polite and hospitable people.  Encounters with such people during incarceration no doubt contribute to an occasionally unpleasant environment.  "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981); see also Hudson v. McMillian, 503 U.S. 1, 9 (1992)

quoting <u>Rhodes</u>, 452 U.S. at 347 ("routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society'."). The Supreme Court has been clear: "the Constitution does not mandate comfortable prisons." <u>Rhodes</u>, 452 U.S. at 349. The problems that wardens and jail administrators face are legion. For that reason, "[p]rison administrators…should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979).

To prevail on his cruel and unusual punishment claim, the Plaintiff must demonstrate that he was subjected to the unnecessary and wanton infliction of pain. Since he does not allege a physical injury of any sort, he is required to show that his conditions of confinement at the Elmore County Jail produced unnecessary and wanton infliction of mental or emotional pain. By way of example, the PLRA completely prohibits a prisoner from bringing a federal civil action "for mental or emotional injury suffered while in custody without a prior showing of *physical injury*." 42 U.S.C. § 1997e(e) (emphasis added). "[T]he legislative history of the PLRA clearly shows that its purpose is to substantially reduce the number of prisoner lawsuits." <u>Harris v. Garner</u>, 216 F.3d 970, 985 (11th Cir. 2000) (<u>en banc</u>). Given this insight into Congress's intent, it is reasonable to conclude that Congress assigned less merit to prisoner lawsuits alleging mental or emotional injury without accompanying physical injury.

Only rarely does a court determine that an inmate has suffered the unnecessary and wanton infliction of mental or emotional pain sufficient to state an Eighth Amendment claim. More often, courts find that allegations of psychological injury, embarrassment, humiliation, mental anguish and fear fall well short of satisfying the cruel and unusual punishment standard. For example, in <u>Napier v. Preslicka</u>, 314 F.3d 528 (11th Cir. 2002), the court affirmed the

dismissal of a detainee's complaint as frivolous under the PLRA where embarrassment and mental anguish were the only "injuries" alleged.  Id. at 534; see also Tribe, 19 Fed. App. at 326 (inmate's fear of attack by fellow inmates did not constitute physical injury for purposes of § 1997e(e)); Herman, 238 F.3d at 665-66 (inmate failed to show requisite physical injury where he sought "money damages for 'emotional distress and mental anguish for fear of the unknown disease, such as the deadly asbestos [sic]'."); Allah, 226 F.3d at 250-51 (affirming dismissal of inmate's claims for compensatory damages for mental and/or emotional injury arising from alleged violation of his First Amendment right).  In Washington v. Harris, 186 Fed. App. 865 (11th Cir. 2006), an inmate alleged that a prison employee crept up behind him, grabbed his genitals, "kissed him on the mouth and threatened to perform oral sex on him." Id. at 865.  As a result of this purported conduct, the inmate claimed "only momentary pain, 'psychological injury', embarrassment, humiliation, and fear." Id. at 866.  The court characterized these "injuries" as de minimus, and emphasized that they "do not rise to the level of constitutional harms." Id.  In conclusion, the court remarked that the prison employee's "conduct, while inappropriate and vulgar, is not repugnant to humanity's conscience." Id.; see also Glisson v. Sangamon County Sheriff's Dep't, 408 F. Supp. 2d 609, 621 (C.D. Ill. 2006) ("not every humiliating, psychological discomfort a prisoner complains of rises to a constitutional violation").

Anderson v. Romero, 72 F.3d 518 (7th Cir. 1995), is especially pertinent under the circumstances.  In Anderson, the inmate-plaintiff sued several corrections officers alleging, *inter alia*, that his constitutional right of privacy had been violated by the disclosure of his HIV-positive status.  At one point in its discussion, the court commented that "[i]f prison officials disseminated humiliating but penologically irrelevant details of a prisoner's medical history,

their action might conceivably constitute the infliction of cruel and unusual punishment." Id. at

523. The court continued its contemplation of the facts of the case, observing that

> even if a right of prisoners to the confidentiality of their medical records in
> general had been clearly established in 1992, it would not follow that a prisoner
> had a right to conceal his HIV status. ***There is a great difference, so far as the
> balance between privacy and public health is concerned, between a
> communicable and a noncommunicable disease***. A person with a
> noncommunicable disease is a danger only to himself, and the compelled
> disclosure of his condition to others is unlikely to further a legitimate interest of
> the state. But ***a person with a communicable disease is a danger to others*** – a
> grave danger when as in the case of HIV-AIDS the disease is invariably fatal and
> has already reached epidemic proportions.

Id. at 524 (emphasis added).

The Seventh Circuit Court of Appeals determined that in neither 1992 nor 1995 was the

law clearly established that disclosure of an HIV-positive inmate's status as such to other

inmates and to guards in order to enable those other inmates and guards to protect themselves

from infection would violate the inmate's constitutional right of privacy. Id. The court

reinforced its decision by pointing to Billman, 56 F.3d 785, in which it "held that the knowing

failure to protect an inmate from the danger posed by an HIV-positive cellmate with a propensity

to rape violates the inmate's right not to be subjected to cruel and unusual punishments." Id. at

524. Ultimately, the court concluded that

> [i]n light of our decision in the *Billman* case, we do not think that defendant
> Douglas can be criticized for having warned inmate Curry that the prisoner in
> whose cell he was seen sleeping was HIV-positive. Or even for having warned
> the inmate barber about Anderson. The danger that a barber would be infected by
> an HIV-positive customer is slight. But so is the danger to a dental worker. Yet
> OSHA, in the regulation that we upheld in the *Martin* case, requires that dental
> workers take precautions against being infected by their patients; and HIV is far
> more prevalent in state prisons than in the population at large.

Id. at 525 (citation omitted).  In closing, the court acknowledged that "[i]t is one thing to warn other prisoners that an inmate is an HIV carrier; it is another to 'punish' him for being a carrier by refusing to allow him to get a haircut or to exercise in the prison yard."  Id. at 526.

The Plaintiff does not allege, and there is no indication, that he was subject to any such "punishment" during his incarceration at the Elmore County Jail.  He was not denied participation in or the privileges of services and activities available at the jail.  To the extent his fellow inmates did not welcome him with open arms, it is unfortunate; however, the prejudice experienced by the Plaintiff at the hands of his fellow inmates, if any, is a matter beyond the control of jail officials.  The alleged disclosure of the Plaintiff's HIV-positive status was a byproduct of the attempt to satisfy multiple legitimate penological objectives.  Under no conceivable version of the facts of this case was the Plaintiff subjected to the unnecessary and wanton infliction of pain in violation of the Eighth Amendment's ban on cruel and unusual punishment.  Consequently, the Plaintiff's claim that he was exposed to cruel and unusual punishment is plainly without merit and, therefore, due to be dismissed.  Alternatively, the Defendants are entitled to judgment in their favor as a matter of law based on qualified immunity.

**E.    Plaintiff's Request for Punitive Damages is Due to be Stricken.**

The Plaintiff's request for punitive damages is due to be stricken.  Absent waiver, which is not present or alleged in this action, claims for punitive damages pursuant to 42 U.S.C. § 1983 are barred by the Eleventh Amendment to the United States Constitution as the award would, in effect, be one against the state as these Defendants are state officials.  See City of Newport v. Fact Concerts, 453 U.S. 247 (1981).  The award of punitive damages against the State of Alabama is similarly barred by statute.  See Ala. Code § 6-11-26 (1975).  Defendant Reaves is an

executive officer of the State and a suit against him is, in essence, a suit against the State of Alabama.  Thus, the Plaintiff's claim for punitive damages against this Defendant is due to be dismissed.  See also Davis, 158 F.3d at 1346 (concluding that "much if not all of Congress's evident intent would be thwarted if prisoners could surmount § 1997e(e) simply by adding a claim for punitive damages").

### F.    Summary Judgment Standard.

On a motion for summary judgment, the court should view the evidence in the light most favorable to the nonmovant.  Greason v. Kemp, 891 F.2d 829, 831 (11th Cir. 1990).  However, a Plaintiff "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only reasonable inferences with a foundation in the record inure to the nonmovant's benefit.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  Reeves, 530 U.S. at 151 quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299.[17]  "A reviewing court need not 'swallow Plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited'."  Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) quoting Massachusetts School of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998).

---

[17] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## MOTION FOR SUMMARY JUDGMENT

Defendant Luke Reaves respectfully requests that this honorable Court treat his Special Report as a Motion for Summary Judgment and grant unto him the same.

## CONCLUSION

The Defendant in this action, Elmore County, Alabama Jail Corrections Officer Luke Reaves, denies each and every allegation made by the Plaintiff, Jeremiah W. Green, in his Complaint. This Defendant neither acted, nor caused anyone else to act, in any manner so as to deprive the Plaintiff of any right to which he was entitled.

**RESPECTFULLY SUBMITTED** this the 7th day of May, 2007.


**s/C. Richard Hill, Jr.**
**C. RICHARD HILL, JR. (HIL045)**
**DANIEL D. FORDHAM (FOR055)**
Attorneys for Defendant Luke Reaves
WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive (36117)
Post Office Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail: rhill@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 7th day of May, 2007, I electronically filed the Defendant's Special Report with the Clerk of the Court using the CM/ECF system, and that I have mailed by United States Mail, postage prepaid, to the following non-CM/ECF participant:

Jeremiah W. Green
Federal Prison Camp – Atlanta
Post Office Box 150160
Atlanta, Georgia 30315-0160


**s/C. Richard Hill, Jr.**
**OF COUNSEL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| JEREMIAH W. GREEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:06-cv-667-WKW-VPM |
| | ) |
| ELMORE COUNTY JAIL, et al., | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF SUE ROBERTS

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF ELMORE | ) |

**BEFORE ME,** the undersigned authority and Notary Public in and for said County and State at large, personally appeared Sue Roberts, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.    My name is Sue Roberts.  I am over the age of nineteen (19) years and competent to make this affidavit.

2.    I am the Warden of the Elmore County Jail.

3.    I have reviewed the Complaint filed in this matter.

4.    I have no personal knowledge of any of the facts stated in the Complaint.  I did not become aware of the allegations made the basis of Mr. Green's Complaint until I was served with the Complaint in this action.

5.    All state and federal prisoners or detainees being held or housed in the Elmore County Jail will be subject to the rules and regulations of the Elmore County Jail.

6. It is the policy of the Elmore County Sheriff's Department to provide proper clothing to persons incarcerated in the Elmore County Jail in order that they may be protected and identified. Pursuant to this policy, federal inmates are issued a red uniform. As Mr. Green was a federal inmate, he was issued a red uniform.

7. It is the policy of the Elmore County Sheriff's Department that inmates incarcerated in the Elmore County Jail be assigned cells in a manner which will ensure the safety and security of the inmates and jail staff and will ensure the orderly operation of the Elmore County Jail.

8. It is the policy of the Elmore County Sheriff's Department that no person be incarcerated in a situation within the Elmore County Jail where his life or health may be threatened by another inmate when, by making the situation known to members of the jail staff, he can be incarcerated elsewhere. All persons being booked into the Elmore County Jail will be given the opportunity to complete an "enemies list." The booking officer will give the arrestee or detainee an opportunity to make known in writing any person within the jail whom he fears or has reason to believe is a threat to him in any way.

9. It is the policy of the Elmore County Sheriff's Department that Sheriff's Department personnel employed at the Elmore County Jail be aware of and protect inmate rights, both civil and legal. These rights include: (a) freedom from discrimination based on race, religion, national origin, sex, handicap or political beliefs; (b) equal access to programs and work assignments; (c) protection from personal abuse, corporal punishment, personal injury, disease, property damage and harassment; and, (d) freedom from reprisals or penalties as a result of seeking administrative or judicial redress. All employees having direct contact

2

with inmates must treat them respectfully and courteously. All inmates shall have equal access to programs, activities and work assignments.

10    It is the policy of the Elmore County Sheriff's Department that members of the Elmore County Jail staff conduct themselves in a manner so as to ensure that inmates are dealt with in a constitutional, honest, fair and impartial manner. Members of the jail staff shall never intentionally demean or humiliate an inmate. The critical discussion of staff members or inmates in the presence of any inmate is strictly forbidden.

11.    It is the policy of the Elmore County Sheriff's Department to identify and make treatment available for those inmates who are to determined to be Human Immunodeficiency Virus (HIV)-positive or infected with Acquired Immune Deficiency Syndrome (AIDS) in a professional and confidential manner and to take precautions in seeking to protect other inmates and members of the jail from exposure to the virus.

12.    It is the policy of the Elmore County Sheriff's Department that members of the jail staff receive and answer any written grievances or requests made by inmates to the Sheriff, Jail Administrator or jail personnel.

13.    Inmates housed in the Elmore County Jail will be furnished with Inmate Request Forms for the purpose of stating their requests or grievances in writing. Forms on which grievances and medical requests may be related to the jail staff are readily available in the jail. Inmates are furnished these forms any time they request one. Jail personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate. An exception exists for requests of an emergency nature, which may be made orally. Inmates are generally encouraged to resolve grievances between themselves and members of the jail staff

3

informally. If this is not possible, the inmate may complete a request form, stating his grievance. The original copy of an inmate's grievance and/or request form, containing the response of a jail official(s), is placed in an inmate's jail file.

14.    Inmates are made aware of the grievance procedure and the medical request procedure by receipt of an inmate handbook at the time they are booked. This handbook describes not only the grievance process, but the general operation and rules of the jail.

15.    Mr. Green did not file a grievance regarding any of the allegations contained in his Complaint.

16.    The cooler and meal trays provided to Mr. Green featured the phrase "black tic" in very discreet, subtle lettering, not "all over it" as alleged by Mr. Green. Mr. Green was provided disposable utensils with which to eat his meals. These practices are likely unnecessary from a medical and health perspective; however, many inmates housed at the Elmore County Jail have gross misconceptions about the transmission of infectious diseases such as HIV, AIDS, Hepatitis A, B and C, and sexually transmitted diseases. Inmates' misconceptions about these and other illnesses lead them to believe that they can "catch" such illnesses from subsequent use of an eating utensil, even if washed, or by drinking from the same water supply as an infected inmate. As a result, inmates with conditions such as HIV and AIDS receive a designated water cooler and meal tray and use disposable eating utensils so that other inmates do not believe that their eating utensils or the meal tray on which their food is served were used previously by an inmate with HIV or AIDS. This practice is intended to preserve institutional order and security.

4

17.    Inmates usually maintain distance between themselves and those they consider "contagious"; therefore, it is unlikely that inmates confined with Mr. Green attempted to intimidate or threaten him.

18.    During Mr. Green's incarceration at the Elmore County Jail, I was not aware, nor did anyone inform me, that he was displeased with his conditions of confinement. Furthermore, I had no knowledge of or input in the placement or classification of Mr. Green upon intake into the jail.

19    I did not violate or cause to be violated any right to which Mr. Green was entitled.

20.    I have not authorized or allowed anyone to act contrary to the Elmore County Jail Manual of Policies and Procedures or to violate the rights of any Elmore County Jail inmate, nor am I aware of any such violation.

21    I certify and state that the documents provided to the Court which are attached to the Defendant's Special Report are true and correct copies of the inmate records, kept at the Elmore County Jail in the regular course of business.

22.    I swear, to the best of my present knowledge, information and belief, that the above statements are true, that I am competent to make this affidavit, and that the above statements were made by drawing from my personal knowledge of the situation.

_____
SUE ROBERTS


**SWORN TO** and **SUBSCRIBED** before me this 24th day of October, 2006.

_____
NOTARY PUBLIC
My Commission Expires: 8/10/09 _____

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JEREMIAH W. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:06-cv-667-WKW-WC |
| | ) | |
| ELMORE COUNTY JAIL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF LUKE REAVES
## PURSUANT TO 28 U.S.C. § 1746

1.    My name is Luke Reaves. I am over the age of nineteen and competent to make this declaration.

2.    I was previously employed as a Corrections Officer at the Elmore County Jail.

3.    On February 21, 2006, I worked the 6:00 a.m. to 6:00 p.m. shift at the Elmore County Jail.

4.    I do not recall, nor am I familiar with, the Plaintiff, Jeremiah Green.

5.    Pursuant to Elmore County Jail policy, a federal inmate incarcerated at the Jail was to receive a red jail uniform.

6.    Occasionally, a federal inmate incarcerated at the Elmore County Jail would receive a jail uniform that was a color other than red (e.g., orange). The Jail had fewer red jail uniforms than other colors of jail uniforms; therefore, it was not uncommon for a federal inmate to receive a jail uniform that was a color other than red if no red jail uniform was available in that inmate's size.

7.    I never violated any policy or procedure in the Elmore County Jail Manual nor did I ever authorize or allow any corrections officer to violate any policy or procedure in the Elmore County Jail Manual. Further, I never observed any violation of Elmore County Jail policy and procedure nor did I ever violate the rights of any inmate based on his or her health status.

8.    I declare under penalty of perjury that the foregoing is true and correct.  I further declare that I am competent to make this declaration, and that the above statements were made by drawing from my personal knowledge of the situation.

LUKE REAVES

DATE:  5-2-07