IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

_____

JEREMIAH W. GREEN,                    *

      Plaintiff,                          *

          v.                              *                2:06-CV-667-WKW
                                                              (WO)
AJA ROBERTS,                           *

      Defendant.                         *

_____


## RECOMMENDATION OF THE MAGISTRATE JUDGE

In this 42 U.S.C. § 1983 action, Jeremiah Green ["Green"], challenges the constitutionality of actions taken against him during a brief incarceration at the Elmore County Jail located in Wetumpka, Alabama.  Specifically, during the approximately 24 hours Green was housed at the Elmore County Jail, he  alleges that  as a result of being given red scrubs and a "black tie" meal tray and cooler, items he claims are given only to inmates who have AIDS, he experienced a violation of his right to privacy, a violation of his right to be treated equally under the Americans with Disabilities Act ["ADA"], and a violation of his right to a safe and secure environment in violation of the Eighth Amendment.   Green names as the defendant Warden Aja Roberts.[1]  He requests trial by jury and seeks declaratory and

---

[1] In the original complaint Green named various "Doe" defendants. During the pendency of this action Green was allowed to amend his complaint after he was able to identify the fictitious defendants. Those defendants were subsequently dismissed as parties to the complaint leaving Warden Roberts as the sole defendant to this cause of action.  (*See Doc. Nos. 61-64.*)

injunctive relief and monetary damages for the alleged deprivations of his constitutional rights. (*Doc. No. 1.*)

In accordance with the  orders of the court, Defendant Roberts filed an answer, special report, supplemental special report, reply, and supporting evidentiary material in response to the allegations contained in the complaint.  The court then informed Green that Defendant Roberts' special report, as supplemented,  may, at any time, be treated as  a motion for summary judgment, and the court explained to Green the proper manner in which to respond to a motion for summary judgment. Green filed  responses to the  special report and supplemental special report filed by Defendant Roberts.   This case is now pending on Defendant Roberts' motion for summary judgment.  Upon consideration of the motion, the evidentiary materials filed in support thereof, and Green's opposition to the motion, the court concludes that Defendant Roberts' motion for summary judgment is due to be granted.

## I.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir.2007) (*per curiam*) (quoting Fed.R.Civ.P. 56(c)).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to

2

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

Defendant Roberts has met her evidentiary burden and demonstrated the absence of a genuine issue of material fact. Thus, the burden shifts to Green to establish, with evidence beyond the pleadings, that a genuine issue material to his case exists. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *Celotex*, 477 U.S. at 324 (non-movant must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'"); Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."). A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

In civil actions filed by inmates, federal courts

must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail

3

on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, ___ U.S. ___, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006).  Consequently, to survive Defendant Roberts' properly supported motions for summary judgment, Green is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not provide sufficient evidence to oppose a motion for summary judgment.  *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging a defendant's actions); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not

4

sufficient to oppose summary judgment . . . .").  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248.  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates

that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party, and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine issue of material fact. *Beard*, ___ U.S. at ___, 126 S.Ct. At 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). In this case, Green fails to demonstrate a requisite genuine issue of material fact in order to preclude summary judgment. *Matsushita*, 475 U.S. at 587.

## II. DISCUSSION

### A. *Injunctive Relief*

Green is no longer incarcerated.[2] The transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate

---

[2]Green was incarcerated at the Federal Prison Camp in Atlanta, Georgia when he filed this complaint on July 26, 2006. During the pendency of this action Green was released from custody.

threat of repeated injury); *Fisher v. Goord*, 981 F. Supp. 140, 168 (W.D. N.Y. 1997) ("A preliminary injunction cannot be issued based on past harm.  The purpose of a preliminary injunction is to prevent future irreparable harm.").  As it is clear from the pleadings and records before the court that Green is no longer incarcerated, his requests for declaratory and preliminary and permanent injunctive relief, which  were rendered moot as a result of his transfer from the county jail and/or release from incarceration, are due to be dismissed. Further, Green fails to meet the rigid requirements for prospective injunctive relief. "  *See Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001)(*quoting Wooden v. Board of Regents of University System of Georgia*, 247 F.3d 1262, 1284 (11th Cir. 2001) (a plaintiff is entitled to injunctive relief only if he can show "a real and immediate - as opposed to a merely conjectural or hypothetical - threat of future injury.")).

B.  *Exhaustion*.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory, even if the process is futile or inadequate. *Higginbottom v. Carter,* 223 F.3d 1259, 1261 (11th Cir. 2000). This mandatory exhaustion requirement applies "irrespective of the forms of relief sought and offered through the administrative avenues." *Booth v. Churner,* 532 U.S. 731, 741 n. 6 (2001).

In *Boxer X v. Harris,* 437 F.3d 1107, 1110 n. 2 (11th Cir. 2006), the court noted that, as a prudential matter, a district court should first consider whether the PLRA bars a prisoner's case before rendering a decision on the merits. In this case, Defendant Roberts argues that Green failed to exhaust his administrative remedies. Green, however, argues that upon his arrival at the Elmore County Jail he was not informed of the grievance procedure nor provided with an inmate handbook explaining the grievance procedure.  Green also submitted with his complaint copies of  letters he sent to the attention of Warden Roberts after his transfer from the county jail in which he advised her that the purpose of his initial letter, dated May 8, 2006, was an attempt at exhausting the  grievance process with respect to the matters now made the subject matter of the instant complaint. Green sent a follow-up letter to Defendant Roberts on May 23, 2006, indicating that he was making a final attempt at contacting her with respect to his efforts to exhaust administrative remedies. (*Doc. No. 1 at Attachments.*)  Green claims that his letters were never responded to nor acknowledged and, therefore, it was impossible for him to exhaust administrative remedies.  (*Id*.)

Although Defendant Roberts argues that Green's inmate file contains no completed inmate request forms, she does not dispute Green's evidence that he  contacted her via certified mail after his departure from the county jail for purposes of undertaking those steps necessary to exhaust the jail's grievance process.  Defendant Roberts further maintains that Green did not wait for a response from her with respect to the letters he sent to her in May 2006 before filing suit against her on July 26, 2006, and, thus, she contends that he cannot

be said to have properly and completely exhausted all available administrative remedies. (*See Doc. Nos. 16, 42*.)

While Green may not have waited six months to receive a response from Defendant Roberts, which Defendant Roberts points out is the time frame for processing grievances according to the United States Department of Justice's Standards for Inmate Grievances, there is no indication that this is the time period applicable to the inmate grievance process at the Elmore County Jail.[3]  Further, it is unclear when or if Defendant Roberts would have responded to Green's attempts to exhaust available administrative remedies despite the fact that he did not file this lawsuit until almost three months  after he initially contacted her by letter indicating that said correspondence was his attempt to satisfy the "first tier" of  the county jail's grievance process rather than waiting, as Defendant Roberts seems to suggest, an additional three months for her to respond.  Under the circumstances, the court concludes that Green met the PLRA exhaustion requirements. *See e.g.*, *Boyd v. Corr. Corp. of America*, 380 F.3d 989, 996 (6th Cir. 2004) ("conclud[ing] that administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance"), *cert. denied*, 544 U.S. 920 (2005); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (holding prison's failure to timely respond to grievance renders administrative remedies unavailable); *Foulk*

---

[3]According to the Elmore County Jail policy regarding inmate grievances, there is no time period specified for when an inmate must file his or her grievance with prison officials.   Once an inmate has submitted a grievance, however, jail policy reflects that after a staff member has reviewed the grievance and written a response, a copy of the grievance with the response should be delivered to the inmate within 72 hours of the time the grievance is received, excluding weekends and holidays.   (*See Doc. No. 28, Attachments at 11-12*.)

*v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001) (holding prisoner exhausted available remedies where prison officials failed to respond to his informal grievances); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir. 1998) (holding "available administrative remedies are exhausted when the time limits for the prison's response set forth in the prison grievance procedures have expired"), *abrogated in part by Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910 (2007) (abrogating the holding in *Underwood* that a district court may dismiss a civil complaint sua sponte for failure to exhaust).

*C. Official Capacity Claims*

Green indicates that he seeks to sue Defendant Roberts in her official as well as her individual capacity. Defendant Roberts, however is immune from monetary damages in her official capacity. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Under all facets of Alabama law, a county sheriff, his jailers, and medical staff act as state officers "when supervising inmates and otherwise operating the county jails." *Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285, 1289 (11th Cir. 1998); *see* Ala. Const. Art. V, § 112 (designates sheriff as member of State's executive department); *see also Parker v. Amerson*, 519 So.2d 442 (Ala. 1987) (county sheriff is executive officer of the State). "[A] state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see*

*Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that Defendant Roberts is  a state official entitled to Eleventh Amendment immunity when sued in her official capacity.  Defendant Roberts is, therefore,  entitled to absolute immunity from Green's claims for monetary damages asserted against her in her official capacity.

*D.  Individual Capacity Claims*[4]

*1. The Privacy Claim*

*a.  HIPPA*

Green complains about a violation of his right to privacy due to the conditions of confinement he experienced while at the Elmore County Jail pursuant to certain jail policies and practices. To the extent Green alleges a right to privacy under the Health Insurance

---

[4]The court notes Defendant Roberts' argument that Green's complaint against her must fail because he fails to demonstrate her personal involvement in the actions about which he complains.  This action went forward against the named defendant based on the allegation that the policies and/or practices at the jail, as more fully described herein, were the moving force behind the constitutional deprivations about which Green complains.  As the warden of the county jail, Defendant Roberts is charged with the governance, discipline, and policy of the jail and enforcing its orders, rules, and regulations.  *See Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir.2003); *Mandel v. Doe,* 888 F.2d 783, 791 (11th Cir.1989).

Portability and Accountability Act, Public Law No. 104-191, 110 Stat. 1936 (1996) ["HIPAA"], this court has determined that the Act does not create a private cause of action. *Means v. Independent Life and Acc. Ins. Co.*, 963 F. Supp. 1131, 1135 (M.D. Ala. 1997)*; see also Webb v. Smart Document Solutions, L.L.C.*, 499 F.3d 1078 (9th Cir. 2007).[5]  Because Green has no private cause of action under HIPPA and he provides no authority to support his claim that a private cause of action exists under HIPPA, the court is without federal subject matter jurisdiction over this claim.

### b.  Fourteenth Amendment

Green maintains that the county jail had a policy and/or  practice in place  designed to identify HIV positive inmates from the general population by the manner in which these inmates were given their meals, by  their single-cell assignment, and by the color of uniform

---

[5]In *Webb*, 499 F.3d at 1083-84, the court found that:

HIPAA aims 'to improve the . . . efficiency and effectiveness of the health information system through the establishment of standards and requirements for the electronic transmission of certain health information.' HIPAA § 261,  Pub.L. 104-191, 110 Stat. 1936 (codified at 42 U.S.C. § 1320d notes). As the Fourth Circuit has noted, Congress intended through this legislation to 'recogniz[e] the importance of protecting the privacy of health information in the midst of the rapid evolution of health information systems.' *S.C. Med. Ass'n v. Thompson*, 327 F.3d 346, 348 (4th Cir. 2003). . . . The statute itself, however, does not specify either how to protect privacy or to transmit health records efficiently and effectively. Instead, it authorizes the Secretary of Health and Human Services to 'adopt standards' that will 'enable health information to be exchanged electronically, . . . consistent with the goals of improving the operation of the health care system and reducing administrative costs,' and that will 'ensure the integrity and confidentiality of [individuals' health] information [and protect against] ... unauthorized uses or disclosures of the information.' *See* 42 U.S.C. § 1320d-2.

they were required to wear.  To the extent Green alleges a violation of his right to privacy under the Fourteenth Amendment due to the jail's alleged policy and/or practice during his stay at the facility which he contends resulted in the non-consenual disclosure of his HIV status, the court finds that he is entitled to no relief.

According to the complaint, Green disclosed to jail personnel upon his arrival at the Elmore County Jail that he had AIDS.  During the intake process Green received a red jumpsuit and disposable slippers.  Green maintains that the other inmates at the jail, either pre-trial detainees or convicted prisoners, were wearing orange jumpsuits.  Green also received an insulated cooler that had the words "black tie" written all over it as well as pictures of bow ties.  He claims that he was not allowed to drink from the communal water fountain, and was placed in a single cell even though other inmates had cellmates.   When other inmates approached Green's cell asking him why he was wearing a red jumpsuit and had a "black tie" thermos,  Green states that he informed them  that he had a cold. Nonetheless, Green goes on to assert that "the inmates knew that the jail had a policy of singling out those with AIDS, placing those inmates with AIDS in red medical scrubs and forcing them to drink from the "Black Tie" thermos/cooler."  At the dinner meal, Green maintains he was "ostracized" because he was fed on a tray which had black ties drawn all over it, given disposable utensils while all other inmates had "regular" utensils, and provided with a clear garbage bag with which to dispose of his food tray and utensils.  Green had one other meal at the jail served in the same manner.  He asserts that to ensure his safety he

13

stayed in his cell during the 24 hours he was at the county jail. (*Doc. No.1 at 8-11*.)

In her dispositive motion, Defendant Roberts maintains that the stated purpose of the prison's policy on the color of uniforms issued to inmates at the Elmore County Jail serves to identify their status as a state, federal, or county inmate for purposes of protection and identification. Because Green was a federal inmate, he received a red uniform. Jail policy further requires that inmates known to have HIV/AIDS be provided treatment for the disease in a confidential and professional manner and also requires that precautions be taken in seeking to protect other inmates and jail staff from exposure to the virus. With regard to the cooler and meal trays about which Green complains, Defendant Robert states that the items in question feature the phrase "black tie" in very discreet, subtle lettering. Defendant Roberts further states that Green also received disposable utensils with which to eat his meals. While disposable eating and drinking containers are likely unnecessary from a medical and health perspective, Defendant Roberts maintains that this practice is followed at the jail due to the "gross misconceptions" Elmore County Jail inmates have about infectious diseases. Such misconceptions, Defendant Roberts states, lead the inmates to believe they can "catch" communicable diseases, including sexually transmitted diseases and Hepatitis A, B and C as well as HIV/AIDS, from subsequent use of untensils, meal trays, and drink containers previously used by an infected inmate even where the utensil, tray, thermos, *etc*., has been washed. Thus, Defendant Roberts asserts that "inmates with conditions such as HIV and AIDS receive a designated water cooler and meal tray and use disposable eating utensils so

14

that other inmates do not believe that their eating utensils or the meal trays on which their food is served were used previously by an inmate with HIV or AIDS.  This practice is intended to preserve institutional order and security." (*Doc. No. 16, Exh. A - Roberts Affidavit; Doc. No. 28, Attachments.*)

Because prisoners retain Constitutional rights, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Turner v. Safley,* 482 U.S. 78,  84 (1987) (quoting *Procunier v. Martinez,* 416 U.S. 396, 405-06 (1974)).  However, "maintaining institutional security and preserving internal discipline are essential goals that may require limitation or retraction of the retained constitutional rights." *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). As the Court noted in  *Turner:*

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in *Martinez,* additional reason to accord deference to the appropriate prison authorities.

*Id.* 482 U.S. at 84-85.

The proper inquiry in those cases where a prison regulation impinges on an inmate's constitutional rights is whether the regulation is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89 (establishing this standard and applying it to a prison policy

15

prohibiting correspondence among inmates of different institutions); *Thornburgh v. Abbott*, 490 U.S. 401, 404, (1989) (applying this analysis to a prison policy allowing the warden to reject publications sent to inmates in certain circumstances).  This "reasonableness" test is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Shabazz*, 482 U.S. 342, 347-49 (1987) (holding that the *Turner v. Safley* standard of review is applicable to claims that an inmate's free exercise rights have been violated).

In determining whether a prison regulation improperly infringes on a prisoner's constitutional rights, the factors to be considered include:  (1) whether there is a valid, rational relationship between the regulation and the legitimate government interest it serves; (2) whether there are alternative means of exercising the right available to the inmates; (3) the impact accommodation of the asserted right will have on jail staff and other inmates; and (4) the absence of ready alternatives as evidence of reasonableness of the regulation.  *Turner*, 482 U.S. at 89-91; *Beard*, 548 U.S. at ___, 126 S.Ct. at 2578. However, a "court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors."  *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999); *Freeman v. Texas Department of Criminal Justice,* 369 F.3d 854, 860 (5th  Cir. 2004) (interpreting the decision in *Turner* as stating that a court need not weigh evenly or even consider each of the factors as rationality is the controlling standard).

This circuit has  held that the involuntary placement of HIV prisoners in separate HIV

dorms does not violate the prisoners' constitutional rights. *Harris v. Thigpen*, 941 F.2d 1495, 1521 (11th Cir. 1991); *see generally Olim v. Wakinekona*, 461 U.S. 238 (1983) ("an inmate normally has no liberty interest in where he is housed."). The Eleventh Circuit upheld the  segregation policy as a reasonable infringement of the right of privacy "in light of the inmate interests at stake (both [HIV] and general population), and the difficult decisions that the [prison officials] must make in determining how best to treat and control . . . the spread of a communicable, incurable, always fatal disease." *Id*. This was despite the potential that inmates might possibly suffer psychological pressure, embarrassment, harassment, rejection, or discrimination due to the involuntary disclosure of the medical information to non-medical persons over which they had no control.  *See id*.

Here, as noted, Green disclosed to prison officials that he had HIV/AIDS upon his arrival at the jail. He does not claim that Defendant Roberts disclosed to anyone at the jail his condition, but rather, that certain policies and/or practices in effect at the jail essentially resulted in the non-consensual disclosure of his HIV/AIDS status via  color of uniform, single cell assignments,  and the manner in which inmates with infectious diseases receive their meals which violated his privacy rights. In support of his contention that jail policy dictated that he be issued  red scrubs in order to identify him as an inmate with AIDS, Green submits the affidavit of Harvey Shenberg, a federal inmate who, on April 4, 2006, was transported from the Federal Prison Camp in Montgomery, Alabama, to the Elmore County Jail for an unspecified period of time. Inmate Shenberg affirms that upon his arrival at the

17

jail he was dressed out in an orange jumpsuit. (*Doc. No. 20, Shenberg Affidavit.*)  The fact, however, that another federal inmate, who was temporarily housed at the Elmore County Jail two months after Green was, received an orange uniform is, in and of itself, not sufficient evidence to demonstrate that Green received a red jumpsuit during his incarceration at the county jail in order to specifically identify him as an inmate with a communicable disease. Nonetheless, assuming, *arguendo*, that Green had at least a limited privacy right in the non-consensual disclosure of his medical information under the circumstances of this case, any encroachment on his privacy rights by the manner in which he was housed, dressed, and/or given meals was reasonable and subject to limitation inasmuch as such privacy rights were outweighed by the legitimate penological interests of the Elmore County Jail in determining how to best treat and control the spread of a transmittable disease. *See Harris*, 941 F.2d at 1521; *see also Doe v. Delie*, 257 F.3d 309, 317 (3rd Cir. 2001) (acknowledging a constitutional right to privacy in one's medical information but stating such right may be curtailed by policy or regulation shown to be "reasonable related to legitimate penological interests") (citing *Turner*, 482 U.S. at 89). Because the matters that can be said to be attributed to Defendant Roberts were those designed to achieve legitimate correctional goals, the court concludes that  she is due to be granted summary judgment on Green's privacy claim.

2.  *Cruel and Unusual Punishment*

Green complains that implementation of a policy and practice at the Elmore County

Jail  which prescribed the manner in which he was dressed, housed, and received meals resulted in the non-consensual disclosure of his HIV status which amounted to cruel and unusual punishment violative of the Eighth Amendment. This claim fails to implicate a violation of  Green's constitutional rights.

The Constitution proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain.  *Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Rhodes v. Chapman*, 452 U.S. 337 (1981).  Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Id.* at 347; *see also Wilson v. Seiter*, 501 U.S. 294 (1991) (overcrowding, without more, does not rise to the level of a constitutional violation).  The Constitution "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the treatment a prisoner receives and the conditions under which he is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).  The Eighth Amendment, however, "does not authorize judicial reconsideration of 'every governmental action affecting the interests or well-being of a prisoner.' " *Campbell v. Sikes*, 169 F.3d 1353, 1362 (11th Cir. 1999) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1988)). "If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.' " *Chandler v. Crosby*, 379 F.3d 1278, 1288-89 (11th Cir.2004) (quoting *Rhodes*, 452 U.S. at 347).

The documentary evidence before the court reflects that jail officials at the Elmore County Jail instituted the clothing and cell assignment policies and the practice and procedures for utilizing disposable food and drink containers, in large part, because of safety, protection, and security concerns.  The fact that Green felt ostracized, degraded, humiliated, and/or insecure as a result of those policies and practices does not modify them from a safety, protection, and security measure.  As previously noted, "the legitimate government interest in the order and security of penal institutions justifies the imposition of certain restraints."  *Procunier*, 416 U.S. at 412-413.  Consequently, enforcement of valid security and safety regulations and procedures does not in and of itself amount to an Eighth Amendment violation for the purposes of an inmate's right to be free from cruel and unusual punishments and it does not do so in this case. Moreover, there is no evidence before the court that the challenged policies and practices resulted in the unnecessary and wanton infliction of pain prohibited by the Eighth Amendment.  *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Whitley v. Albers*, 475 U.S. 312, 319 (1976).  Defendant Roberts is, therefore, entitled to summary judgment on Green's Eight Amendment claim.

*E.  Americans With Disabilities Act Claim*

Green alleges in conclusory fashion that he was subjected to discrimination while incarcerated at the Elmore County Jail in violation of the Americans with Disabilities Act ["ADA"] by "his scarlet colored 'garb' and his vividly marked food tray and his exclusive

water cooler," which he claims effectively disclosed his HIV/AIDS status.  (*Doc. No. 20 at 5; see also Doc. No. 1 at 11*.)  The ADA prohibits the exclusion of otherwise qualified participants from any program or benefits on account of their disability.  42 U.S.C. § 12132. Title II, 42 U.S.C. § 12132 provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services or activities of a public entity or be subjected to discrimination by such entity." Prisons and jails are public entities covered by the ADA. *See, e.g., Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206 (1998). To state a claim under Title II of the ADA, Green must allege that: (1) he is a 'qualified person with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See Miller v. King,* 384 F.3d 1248, 1265 (11th Cir. 2004).

Defendant Roberts argues that it is debatable whether Green may be considered a "qualified individual with a disability" for purposes of the ADA and further maintains that Green has not alleged nor demonstrated how he was excluded or denied services, programs, or activities because of any disability. (*Doc. Nos. 16, 42*.)  Green responds in a conclusory manner that he is a qualified person with a disability, he has been discriminated against by a public entity, and the discrimination was a result of his disability. (*Doc. No. 20* at 5.) Citing to *Bragdon v. Abbott,* 524 U.S. 624, 2d 540 (1998), Green states that HIV is a "disability"

under the ADA and  that he is in the so-called symptomatic phase - "better known as full blown AIDS."  (*Id*.)

Contrary to Green's position, in *Bragdon* the Supreme Court declined to address the issue of whether an HIV infection is a *per se* disability under the ADA. *Id,* 524 U.S. at 641-42 (1998). Indeed, "[i]t is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 198 (2002). Since § 12102(2) defines disability "with respect to an individual," the existence of a disability is to be determined in "a case-by-case manner." *Id.*  at 198. Consequently, Green cannot establish the existence of a "disability" under the ADA merely by stating that he suffered from AIDS during the relevant period of time. Nonetheless, in this case, even assuming that Green's affliction with HIV/AIDS is a disability within the meaning of the ADA and that he may be considered a "qualified individual" as such is defined under the ADA, *see Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 n.4 (11th Cir. 2001), he would not have a cause of action because he has not demonstrated exclusion from a service, program, or activity, nor has he shown any discrimination, which is required by the ADA.  Green acknowledges that he was provided food, clothing and shelter at the county jail but claims it was not provided in a discreet manner thereby allowing his medical condition to become known to others. The court finds that this allegation fails to state a claim under the ADA. Therefore, Defendant Roberts is due to be granted summary judgment on Green's ADA claim.

### III. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. Defendant Roberts' motion for summary judgment, as supplemented (*Doc. No. 16*), be GRANTED;

2. Judgment be ENTERED in favor of Defendant Roberts and against Plaintiff;

3. The costs of this proceeding be TAXED against Plaintiff for which execution may issue.

It is further

ORDERED that on or before **October 19th, 2008,** the parties may file objections to the Recommendation.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en*

*banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done,  this 6th day of October 2008.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE